ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 2 5 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                       :

UNITED STATES OF AMERICA    :     **INFORMATION**    **JUDGE SWAIN**

        - v. -      :    22 Cr. ___ (LTS)

AIMEE HARRIS and      :
ROBERT KURLANDER,       **22 CRIM 457**

     Defendants.    :

- - - - - - - - - - - - - - - X

## COUNT ONE

### (Conspiracy to Commit
### Interstate Transportation of Stolen Property)

The United States Attorney charges:

### Overview

1.  In or about September 2020, AIMEE HARRIS and ROBERT

KURLANDER, the defendants, conspired to steal, transport across

state lines, and sell personal property that belonged to an

individual (the "Victim") whom HARRIS and KURLANDER knew was an

immediate family member of a then-former government official who

was a candidate for national political office ("Candidate-1").

The Victim had stored the property in a private residence in

Delray Beach, Florida (the "Residence"), at which HARRIS was

temporarily residing.  After HARRIS stole the property, she

enlisted KURLANDER to help her facilitate its sale.  HARRIS and

KURLANDER then met in Manhattan with employees of an

organization based in Mamaroneck, New York (the "Organization").

During that meeting, HARRIS described the circumstances of how she had obtained the property, and provided the property to the Organization.  After the meeting, and at the Organization's request, HARRIS and KURLANDER returned to Florida to obtain more of the Victim's property in order to provide it to the Organization.  They later met with an Organization employee in Florida and gave that employee more of the Victim's stolen property, believing that the Organization would transport or cause the transport of the stolen property from Florida to the Organization's offices in New York.  The Organization then did so.  Ultimately, the Organization paid HARRIS and KURLANDER each $20,000.

### HARRIS's Initial Theft of the Victim's Property

2.    In or about the spring of 2020, the Victim resided with a friend (the "Friend") at the Residence.  When the Victim moved out of the Residence, on or about June 17, 2020, the Friend gave the Victim permission to store a significant number of personal items at the Residence, which the Victim did.  Accordingly, the Victim stored at the Residence, among other things, a handwritten journal containing highly personal entries (the "Journal"), tax records, a digital camera, a digital storage card containing private family photographs, a cellphone, books, clothing, and luggage.

3.    On or about June 19, 2020, approximately two days

2

after the Victim moved out of the Residence and stored property there, the Friend invited AIMEE HARRIS, the defendant, to temporarily stay in the same room of the Residence that the Victim had previously used.  While there, HARRIS discovered the property that the Victim was storing in the Residence.  At the time, HARRIS knew that the Victim was a member of the immediate family of Candidate-1.

4.    On or about August 19, 2020, AIMEE HARRIS, the defendant, contacted ROBERT KURLANDER, the defendant, and asked for his assistance in selling certain of the Victim's property, including the Journal and the digital storage card containing private family photographs.  That same day, KURLANDER texted HARRIS that he would help her "make a SHIT TON of money" from selling the Victim's property.

HARRIS and KURLANDER's First Attempt to Sell the Stolen Property

5.    On or about September 6, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, attended a political fundraiser in Florida meant to benefit the campaign of an individual ("Candidate-2") who was running for office against Candidate-1. HARRIS and KURLANDER attended the fundraiser with the intent of showing the Victim's stolen property to a campaign representative of Candidate-2, hoping that the political campaign would purchase it.

6.    In advance of the fundraiser, ROBERT KURLANDER, the

3

defendant, texted AIMEE HARRIS, the defendant, "On Sunday you may have a chance to make so much money," and reminded her to bring the property to the event.  By that time, HARRIS had stolen additional items belonging to the Victim from the Residence and responded to KURLANDER, "Omg.  Coming with stuff that neither one of us have seen or spoken about," and added, "I can't wait to show you what Mama has to bring Papa."

7.    On or about September 10, 2020, a representative of Candidate-2's political campaign conveyed to AIMEE HARRIS and ROBERT KURLANDER, the defendants, that the campaign was not interested in purchasing the property and advised HARRIS and KURLANDER to provide the items to the Federal Bureau of Investigation ("FBI").  KURLANDER texted HARRIS, "[Candidate-2] campaign can't use it.  They want it to go to the FBI.  There is NO WAY [Candidate-2] can use this.  It has to be done a different way . . . ."

HARRIS and KURLANDER's Initial Contact With the Organization

8.    Later on or about September 10, 2020, ROBERT KURLANDER, the defendant, texted AIMEE HARRIS, the defendant, "I have a call with [the Organization] today," "I'm gonna find a way for you to make some money from this."

9.    On or about that same day, September 10, 2020, an employee of the Organization ("Employee-1") instructed AIMEE HARRIS and ROBERT KURLANDER, the defendants, to use an encrypted

4

application to communicate with the Organization.  Thereafter, KURLANDER used such an application to send photographs to the Organization of some of the Victim's property that HARRIS had removed from the Residence.  After receiving the photographs, the Organization offered to pay for airfare, hotel, and car service for HARRIS and KURLANDER to transport the property from Florida to New York City.

First Interstate Transportation of the Victim's Stolen Property

10.  On or about September 12, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, flew at the Organization's expense from Florida to New Jersey with certain of the Victim's items that HARRIS had stolen from the Residence, including, among other things, the Journal, a digital camera, and the digital storage card containing private family photographs. Shortly before the flight, KURLANDER texted HARRIS, "Let's have fun !!!!!  And make money."  HARRIS "liked" the text message. After landing in New Jersey, HARRIS and KURLANDER – with the Victim's property in tow – took a car service to a luxury hotel in New York City, at the Organization's expense.

11.  That evening, on or about September 12, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, met at the Manhattan hotel with employees of the Organization, including Employee-1 and an executive of the Organization ("Executive-1"). At this meeting, HARRIS and KURLANDER provided the Victim's

property that HARRIS had removed from the Residence to the Organization.  HARRIS described how she obtained that property; disclosed that the Victim had additional property stored in the Residence; and explained that HARRIS continued to have access to the Residence.  HARRIS's explanations to the Organization during this meeting confirmed for KURLANDER that HARRIS had stolen the Victim's property.

12.  Also during the course of the meeting on or about September 12, 2020, and at a dinner that same evening, as well as during conversations held within the week, Employee-1 told AIMEE HARRIS and ROBERT KURLANDER, the defendants, that Employee-1 wanted HARRIS and KURLANDER to provide more of the Victim's property to the Organization, in part as a means of authenticating the Journal, and that the value of the items previously provided by HARRIS and KURLANDER to the Organization would increase if additional items were obtained.  Additionally, during the September 12, 2020 dinner, Executive-1 agreed to make an initial payment from the Organization to HARRIS of $10,000 for the property that HARRIS and KURLANDER had provided the Organization earlier in the day.

13.  Two days later, and the day after AIMEE HARRIS and ROBERT KURLANDER, the defendants, returned to Florida from New York at the Organization's expense, on or about September 14, 2020, KURLANDER set out the plan to sell the Victim's stolen

property to the Organization, texting HARRIS, "I'm expecting that they're gonna pay up to $100,000 each maybe more . . . .  I made it so that the 10,000 is NOT your only payment as it was written and if this does turn into something good or blockbusting then I'll get us more money.  They of course come across as the nicest people in the world but their job is to pay the least and they aren't your or my best friends.  They are in a sketchy business and here they are taking what's literally a stolen diary and info . . . and trying to make a story that will ruin [the Victim's] life and try and effect the election.  [The Victim] can easily be thinking all her stuff is there and not concerned about it. . . we have to tread even more carefully and that stuff needs to be gone through by us and if anything worthwhile it needs to be turned over and MUST be out of that house."

## Additional Theft of the Victim's Property

14.  After AIMEE HARRIS, the defendant, had described the circumstances under which she had obtained the Victim's property, and between on or about September 13 and 17, 2020, Employee-1 asked HARRIS and ROBERT KURLANDER, the defendant, to return to the Residence so that they could obtain and provide to the Organization more of the Victim's belongings that HARRIS had described earlier but not yet provided to the Organization. Employee-1 also repeatedly informed HARRIS and KURLANDER that he

was working in consultation with and at the direction of an executive at the Organization ("Executive-2").

15.    On or about September 17, 2020, ROBERT KURLANDER, the defendant, used an encrypted application to text Employee-1 that removing the Victim's property and providing it to the Organization was risky and so the Organization should agree to pay them more money: "[w]e don't want to do more or anything else or give anything else until we have some consideration spelled out.  We are doing everything we say we will do.  It's just not fair.  We are taking huge risks.  This isn't fair."

16.    Around that same time, AIMEE HARRIS and ROBERT KURLANDER, the defendants, and the Organization engaged in negotiations for additional payments to be made by the Organization to HARRIS and KURLANDER in exchange for the Victim's property.

Second Interstate Transportation of the Victim's Stolen Property

17.    On or about September 17, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, stole more of the Victim's property from the Residence, including, among other things, tax documents, clothing, and luggage, with the intent of providing those items to the Organization.

18.    That same day, on or about September 17, 2020, Employee-1 traveled from New York to Florida to personally retrieve the additional property that AIMEE HARRIS and ROBERT

KURLANDER, the defendants, had just stolen out of the Residence
and from the Victim.  All three of them met in Florida, and
HARRIS and KURLANDER provided the items to Employee-1.  The
following day, on or about September 18, 2020, KURLANDER met
with Employee-1 again in Florida and provided an additional bag
of the Victim's property to Employee-1.  HARRIS and KURLANDER
provided these items to Employee-1 with the understanding that
Employee-1 intended to transport or cause the transportation of
those items from Florida to New York.

19.   The next day, on or about September 19, 2020,
Employee-1 shipped the stolen property from Florida to the
Organization's offices in New York.

<u>The Organization Paid HARRIS and KURLANDER<br>for the Victim's Property</u>

20.   In or about September and October 2020, and consistent
with the encrypted message that ROBERT KURLANDER, the defendant,
had sent on or about September 17, 2020, the Organization paid
AIMEE HARRIS and ROBERT KURLANDER, the defendants, a total of
$40,000 for the Victim's stolen property, as follows:

a.   On or about September 18, 2020, the Organization
paid $10,000 to a representative of HARRIS.

b.   On or about October 21, 2020, the Organization
paid $20,000 to a representative of KURLANDER.

c.   On or about October 24, 2020, the Organization

paid $10,000 to a representative of HARRIS.

## Statutory Allegations

21.    In or about September 2020, in the Southern District of New York and elsewhere, AIMEE HARRIS and ROBERT KURLANDER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314.

22.    It was a part and object of the conspiracy that AIMEE HARRIS and ROBERT KURLANDER, the defendants, and others known and unknown, would and did transport, transmit, and transfer in interstate and foreign commerce goods, wares, merchandise, securities, and money, of the value of $5,000 and more, knowing the same to have been stolen, converted, and taken by fraud.

## Overt Acts

23.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about September 12, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, transported certain of the Victim's stolen property from Florida to New York.

b.    On or about September 17, 2020, HARRIS and

10

KURLANDER provided more of the Victim's stolen property to Employee-1 with the understanding that Employee-1 would cause the property to be transported from Florida to New York.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

24.    As a result of committing the offense alleged in Count One of this Information, AIMEE HARRIS and ROBERT KURLANDER, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## Substitute Asset Provision

25.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the

11

Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable

property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**AIMEE HARRIS and**
**ROBERT KURLANDER,**

**Defendants.**

---

**INFORMATION**

22 Cr. _____ (LTS)

(18 U.S.C. § 371.)

DAMIAN WILLIAMS
United States Attorney

---