

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 20, 2023

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Aimee Harris*, **22 Cr. 457 (LTS)**

Dear Chief Judge Swain:

      The Government respectfully submits this letter in advance of the September 27, 2023 sentencing of Aimee Harris (the "defendant"). The defendant stole a victim's property and transported it across state lines for money. She committed a serious crime, but the Government recognizes that there are mitigating factors present. For the reasons set forth below, the Government submits that a sentence that includes a period of three years of supervised release with six months' home confinement, would be sufficient but not greater than necessary to achieve the purposes of sentencing.

    **A.  Factual Background**

      1.  <u>Overview</u>

      This case arose from the defendant's theft of, and agreement to transport across state lines and sell, the personal property of an individual (the "Victim"). At the time the defendant committed the crime, she knew the Victim was an immediate family member of a then-former government official who was a candidate for national public office ("Candidate-1"). (PSR ¶ 8[1]).

      In or about September 2020, Aimee Harris was temporarily residing in a friend's private residence in Delray Beach, Florida (the "Residence"), where she gained access to the Victim's belongings. (*Id.*). After Harris stole the property, she enlisted the assistance of her co-defendant, Robert Kurlander, to facilitate its sale. (*Id.*). Harris and Kurlander traveled from Florida to Manhattan, with stolen property in tow, to meet with members of an organization based in Mamaroneck, New York (the "Organization"), which was interested in purchasing the property. (*See id.*).

---

[1] "PSR" refers to the final Presentence Investigation Report prepared by the U.S. Probation Office ("Probation") and filed on November 18, 2022. (Dkt. No. 20).

During that meeting, Harris described how she obtained the property and provided it to the Organization. (PSR ¶ 9). After the meeting, at the direction of the Organization, Harris and Kurlander returned to the Residence in Florida to obtain more of the Victim's property and provide it to the Organization. (*Id.*). They then met in Florida with a representative of the Organization to hand over the property, understanding that it would be transported back to the Organization's office in New York. (*Id.*). Harris and Kurlander were each paid $20,000 for the stolen property. (*Id.*).

2. Harris's Initial Theft of the Victim's Property

In or about the spring of 2020, the Victim resided at the Residence in Florida. (PSR ¶ 10). The Victim moved out of the Residence on June 17, 2020, at which point, the Victim's friend, the owner of the Residence, gave the Victim permission to continue storing a significant number of personal items at the Residence. (*Id.*). Among other things, the Victim stored at the Residence a handwritten journal containing highly personal entries (the "Journal"), tax records, a digital camera, a digital storage card containing private family photographs, a cellphone, books, clothing, and luggage. (*Id.*).

On or about June 19, 2020, approximately two days after the Victim moved out of the Residence, Harris began staying in the same room that the Victim had previously used. (PSR ¶ 11). While staying at the Residence, Harris discovered the personal property that the Victim was storing there. (*Id.*). At that time, Harris knew that the Victim was a member of the immediate family of Candidate-1. (*Id.*). Two months later, on August 19, 2020, Harris contacted Kurlander and asked for his assistance in selling some of the Victim's personal property, including the Journal and the digital storage card containing private family photographs. (PSR ¶ 12). That same day Kurlander texted Harris, writing that he would help her "make a SHIT TON of money" from selling the Victim's property. (*Id.*).

3. Harris and Kurlander's Attempts to Sell the Stolen Property

On September 6, 2020, in an attempt to market the stolen property, Harris and Kurlander attended a political fundraiser in Florida to benefit the campaign of an individual ("Candidate-2") who was running for office against Candidate-1. (PSR ¶ 13). Harris and Kurlander hoped the campaign would agree to purchase the property. (*Id.*). Leading up to the fundraiser, Kurlander texted Harris to remind her to bring the stolen property to the event, writing "On Sunday you may have a chance to make so much money." (PSR ¶ 14.). Harris, who had stolen additional items belonging to the Victim, responded, "Omg. Coming with stuff that neither one of us have seen or spoken about," adding "I can't wait to show you what Mama has to bring to Papa." (*Id.*).

On September 10, 2020, a representative of Candidate-2's campaign conveyed to Harris and Kurlander that the campaign was not interested in purchasing the Victim's property and advised Harris and Kurlander to provide the items to the Federal Bureau of Investigation. (PSR ¶ 15). Kurlander texted Harris, "[Candidate-2] campaign can't use it. They want it to go to the FBI. There is NO WAY [Candidate-2] can use this. It has to be done a different way . . ." (*Id.*).

Later that same day, Kurlander texted Harris, "I have a call with [the Organization] today," and "I'm gonna find a way for you to make some money from this." (PSR ¶ 16). An employee of the Organization ("Employee-1") then instructed Harris and Kurlander to use an encrypted application to communicate with the Organization going forward. (PSR ¶ 17). Thereafter, Kurlander used such an application to send photographs to the Organization of some of the Victim's property that Harris had taken from the Residence. After receiving the photographs, the Organization offered to pay for Harris and Kurlander to travel to New York to transport the property from Florida. (*Id.*).

    4. <u>First Interstate Transportation of the Victim's Stolen Property</u>

Two days later, on September 12, 2020, Harris and Kurlander flew at the Organization's expense from Florida to New Jersey, transporting certain of the Victim's stolen property with them, including the Journal, a digital camera, and the digital storage card. (PSR ¶ 18). After landing in New Jersey, Harris and Kurlander, with the Victim's property, took a car service to a luxury hotel in Manhattan at the Organization's expense. (*Id.*). That evening, on September 12, 2020, Harris and Kurlander met at the hotel with employees of the Organization, including Employee-1 and an executive staff member ("Executive-1"). (PSR ¶ 19). During that meeting, Harris and Kurlander provided the Victim's stolen property to the Organization. (*Id.*). Harris explained to the employees of the Organization how she obtained the property, that the Victim had additional property still stored at the Residence, and that Harris continued to have access to the Residence. (*Id.*).

During the course of the September 12, 2020 meeting, and at dinner that same evening and during other conversations later that week, Employee-1 told Harris and Kurlander that Employee-1 wanted Harris and Kurlander to provide additional of the Victim's property to the Organization, in part to authenticate the Journal, and that the value of the items they previously provided to the Organization would increase if they obtained additional items. (PSR ¶ 20). During dinner on September 12, 2020, Executive-1 also agreed to make an initial payment from the Organization to Harris of $10,000 for the property that Harris and Kurlander had already provided. (*Id.*).

Two days later, after Harris and Kurlander returned to Florida, Kurlander texted Harris about pursuing additional payment from the Organization, writing "I'm expecting that they're gonna pay up to $100,00 each maybe more," and promising Harris to get them more money "if this turn[ed] into something good or blockbusting." (PSR ¶ 21). Kurlander further texted:

> They of course come across as the nicest people in the world but their job is to pay the least and they aren't your or my best friends. They are in a sketchy business and here they are taking what's literally a stolen diary and info…and trying to make a story that will ruin [the Victim's] life and try and effect the election. [The Victim] can easily be thinking all her stuff is there and not concerned about it…we have to tread even more carefully and that stuff needs to be gone through by us and if anything worthwhile it needs to be turned over and MUST be out of that house.

(PSR ¶ 21).

5. Additional Theft of the Victim's Property

After Harris described the circumstances under which she had initially obtained the Victim's property, between September 13, 2020 and September 17, 2020, Employee-1 asked Harris and Kurlander to return to the Residence so that they could obtain and provide to the Organization more of the Victim's belongings. (PSR ¶ 22). On September 17, 2020, Kurlander used an encrypted application to text Employee-1 that removing the Victim's property and providing it to the Organization was risky and that the Organization should agree to pay them more money as a result:

> We don't want to do more or anything else or give anything else until we have some consideration spelled out. We are doing everything we say we will do. It's just not fair. We are taking huge risks. This isn't fair.

(PSR ¶ 23). Around that same time, Harris and Kurlander and the Organization negotiated additional payments for the Victim's property. (*Id.*).

6. Second Interstate Transportation of the Victim's Stolen Property

On September 17, 2020, Harris and Kurlander stole more of the Victim's property from the Residence, including, among other things, tax documents, clothing, and luggage, in order to provide those items to the Organization. (PSR ¶ 25). That same day, Employee-1 traveled from New York to Florida to personally retrieve the additional property that Harris and Kurlander had stolen. (PSR ¶ 26). The three met in Florida, and Harris and Kurlander turned over the stolen property. (*Id.*). The following day, on September 18, 2020, Kurlander met with Employee-1 again in Florida and turned over an additional bag of the Victim's property to Employee-1. (*Id.*). At the time that Harris and Kurlander provided the additional stolen items to Employee-1, they understood that Employee-1 intended to transport or cause the transportation of those items to New York. (*Id.*). The next day, Employee-1 shipped the stolen property from Florida to the Organization's office in New York. (PSR ¶ 27).

7. The Organization Payment of Harris and Kurlander

In September and October 2020, the Organization paid Harris and Kurlander a total of $40,000 for the Victim's stolen property. Harris received one $10,000 payment on September 18, 2020, and a second $10,000 payment on October 24, 2020. (PSR ¶ 28). Kurlander received a single $20,000 payment on October 21, 2020. (*Id.*).

B. Procedural History

On August 25, 2022, Aimee Harris voluntarily surrendered. Harris waived indictment and was arraigned on the above-referenced one-count Information, charging her with conspiring to commit interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314. (PSR ¶ 1). Harris entered a plea of guilty before United States Magistrate Judge Sarah L. Cave that same day, pursuant to a written plea agreement (the "Plea Agreement"). (PSR ¶ 3).

Pursuant to the Plea Agreement, the defendant stipulated to a Guidelines range of eight to fourteen months' imprisonment, based on a total offense level of 11 and a criminal history category of I. (PSR ¶ 100). The applicable offense level reflects a total loss amount of between $15,000 and $40,000. (PSR ¶ 4(d)). As part of her guilty plea, the defendant also consented to a preliminary order of forfeiture, agreeing to forfeit a total of $20,000, representing the proceeds traceable to the commission of the offense.[2]

At the plea hearing, the defendant admitted to the following conduct:

> In September 2020, I found property, including a journal, belonging to another person in a place where I was living. Knowing that I did not have a right to take the property, I agreed with another person and did cause a journal to be transported from Florida to New York City. The value of the journal was more than $5,000. I know this because I did not directly receive the money for the journal; the organization that purchased it sent two payments of $10,000 each for my benefit to lawyers that were representing me in a child custody matter.

(Dkt. No. 12 at 20).

In the PSR, Probation calculates the applicable Guidelines consistent with the calculation set forth in the Plea Agreement. (*Id.* ¶¶ 4, 101). Accordingly, the Guidelines Range calculated in the PSR is eight to fourteen months' imprisonment. (*Id.*). Probation recommended a variance of no incarceration and three years' probation. (PSR at 22).

On September 13, 2023, the defendant filed her sentencing submission under seal. The defendant requests a sentence of probation.

The Government notes that there is an anticipated Guidelines amendment in November 2023 that will provide a two-level decrease for certain zero-point offenders under a new version of U.S.S.G. § 4C1.1. (*See also* Def. Sub. 4). The Government believes a two-level offense level reduction would be warranted in this matter under the proposed new Section 4C1.1 of the November 2023 version of the Sentencing Guidelines manual if it were in effect today. Accordingly, the Government respectfully requests that the Court sentence the defendant under Section 3553(a) as though the applicable Guidelines sentencing range is 4 to 10 months' imprisonment and the applicable Guidelines fine range is $2,000 to $20,000, as if these ranges were based on an offense level of 9 and Criminal History Category I.

---

[2] The proposed Consent Preliminary Order of Forfeiture, which has been fully executed by the parties, is submitted herewith.

### C. A Sentence of Supervision With Six Months' Home Confinement is Appropriate in This Case

    1. <u>Applicable Law</u>

The Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, a court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to promote respect for the law, to provide just punishment for the offense, to adequately deter criminal conduct, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

    2. <u>Discussion</u>

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including Harris's background, the nature and circumstances of the offense, and the importance of general and specific deterrence, a sentence that includes three years of supervised release with six months' home confinement would be sufficient but not greater than necessary to accomplish the purposes of sentencing.

*First*, the nature and seriousness of the offense and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). Harris's criminal conduct was serious. "This scandalous conduct is appalling and must not be overlooked." (PSR at 24). She wrongfully exploited her physical access to the intimate belongings of someone whom she did not know personally, but knew as a public figure who whose property would fetch a handsome price tag. Property that the Victim understandably believed she had kept safe and private by storing it in a friend's private home. To complete her crime, the defendant took advantage of the kindness of the owner of the Residence, who let the defendant stay in the Residence for an extended period of time at no cost. The defendant violated her friend's trust by brazenly and repeatedly stealing the Victim's property from under the friend's roof.

*Second*, the needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a sentence that includes six months' home confinement. *See* 18 U.S.C. § 3553(a)(2)(A), (2)(B). Harris engaged in a crime that began as one of opportunity, but then undertook deliberate and extraordinary attempts to capitalize on that opportunity and maximize her gains. She engaged Kurlander to assist her in monetizing the Victim's stolen property. She flew to New York with some of the stolen property. She then went back to the Residence and stole more property. At no time did Harris exhibit any respect for the law. Even when Candidate-2's campaign declined to take custody of the stolen property and recommended that Harris provide the property to the FBI, she and Kurlander instead looked for other ways to market the stolen property at the Victim's expense, for their own personal gain.

"Considerations of . . . deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime." *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018).

In addition to enriching herself, Harris also sought to affect the political process through the commission of a crime. The communications between her and Kurlander make clear that one of their motivations was to damage the Victim and harm Candidate-1's campaign. While the substance of Harris's political views is of no relevance to this case, the manner in which she advanced them was far outside of lawful political activism of any kind. Stealing personal belongings of a candidate's family member, and selling them to an organization to exploit them for political gain, was wrong and illegal no matter the political agenda. Such criminal conduct does not merely harm the Victim, but seeks to undermine the political process. The sentence imposed upon Harris should adequately account for the need to deter others from engaging in similar conduct, particularly if one might ask him or herself if the political ends may justify the criminal means. The calculus must be clear that criminal conduct of this sort will not be tolerated regardless of one's political affiliation, ideology, or motivation.

*Third*, a sentence of six months' home confinement is similarly necessary for specific deterrence. Although Harris waived indictment and pled guilty after recognizing the strength of the evidence against her, she has, thus far, demonstrated no remorse or regret for her actions. Her submission does not acknowledge, much less apologize for, the harm that the Victim suffered as a result of her actions. In addition, Harris's conduct while on pretrial release suggests a period of home confinement is necessary to deter her from committing further crimes. In January 2023, Harris was cited for running a red light, failing to register her vehicle, and lacking proof of car insurance. (Jan. 18. 2023 Violation Mem.). More troubling, in July 2023, Harris was arrested and charged with, among other things, driving under the influence with property damage, and tested positive for marijuana. (July 20, 2023 Violation Mem.; *see also* PSR ¶ 84 (Harris also tested positive for marijuana in August 2022)). These recent actions, which Harris ignores entirely in her submission, suggest that a sentence of home confinement is appropriate.

*Fourth*, Harris's requested sentence of probation, without any period of confinement, would fail to adequately balance and account for the 18 U.S.C. § 3553(a) factors in this case. The Government does not dispute that there are significant mitigating factors to consider, including the defendant's ability to remain present in her children's lives. As noted in the PSR, however, some caution is warranted with respect to the defendant's representations regarding these matters. For example, Harris cites an ongoing child custody dispute as one of the mitigating factors. However, the Probation Office explains that at least some of her allegations relating to that matter have been rejected: in April 2021 a court "deemed Harris' testimony [in the custody matter] as not credible, and her conduct was described as egregious and not in the interest of the minor children." (PSR at 23; *see also* PSR ¶ 67). At bottom, a sentence including supervision and a period of home confinement is necessary to account for the seriousness of the conduct at issue, and to send the appropriate message to Harris, others similarly situated, the public, and the Victim about the consequences of this kind of criminal conduct.

### D. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence that includes three years of supervised release with six months' home confinement. Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
    Jacqueline C. Kelly
    Robert B. Sobelman
    Mitzi S. Steiner
    Assistant United States Attorneys
    (212) 637-2456/2616/2284

cc:    Kestine M. Thiele, Esq., and Anthony Cecutti, Esq. (by ECF)