LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
Fax: (212) 962-5037
anthonycecutti@gmail.com

September 13, 2023

**BY ECF & Electronic Mail**
Honorable Laura T. Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

### SENTENCING MEMORANDUM

Re:     United States v. Aimee Harris, 22 Cr. 457 (LTS)

Dear Judge Swain:

We respectfully submit this memorandum on behalf of Aimee Harris, whose sentencing is currently scheduled for September 27, 2023.

On August 25, 2022, Aimee pled guilty before Magistrate Judge Sarah L. Cave to a one-count felony Information, charging that in September 2020, in the Southern District of New York, Aimee conspired to commit interstate transportation of stolen property, in violation of 18 U.S.C § 2314, which carries a maximum term of imprisonment of five years. Aimee accepts full responsibility for what she has done, but her conduct here was aberrational. She is a compassionate and thoughtful woman, and most notably, a dedicated mother. Further, she has no criminal history whatsoever. For the reasons set forth below, a sentence of probation is sufficient, but not greater than necessary, to satisfy the sentencing factors and purposes outlined in 18 U.S.C. § 3553(a).

### I.     Circumstances of Aimee's Life

As a girl, Aimee could be found at cheerleading practice or at a local park in Newport News, Virginia playing tennis with her friends. She shared a middle-class home with her best friends—her older and younger sister. While Aimee looks fondly on many childhood memories, she is still working to heal from others.

Aimee's parents divorced when she was two years old. Between the ages of two and four, Aimee was sexually abused by a tenant, a police officer, who was renting a room in her father's apartment building. When Aimee shared what happened to her with her father, he told her not to speak of it again, worried about potential repercussions for the family. Soon after the tragic incident, her father relocated from Virginia to Florida. During Aimee's formative years, she occasionally saw him during holidays. She remembers going years without speaking to him, in part, because his new wife was psychologically and emotionally abusive towards Aimee. Aimee's mother remarried twice. Her first stepfather was far from warm and often made Aimee stay in her room. Her second stepfather suffered from alcoholism, and Aimee was forced to watch him and her mother fight on almost a daily basis.

Aimee first engaged in mental health counseling when she was in middle school. At the time, she was diagnosed with depression. Because at that age she could not fully understand the benefit of counseling, she stopped for a while. Then, she went on to high school, earning B's and C's, before attending a few semesters of community college. She worked jobs steadily as a babysitter, bartender, waitress, and receptionist. She reconnected with her father and worked as his assistant at his life safety management company.

Around 2010, Aimee began a new romantic relationship. Though Aimee believed that they enjoyed a fun, healthy relationship at first, her boyfriend's opiate addiction eventually came to light. In the following months, he turned violent. She was the victim of domestic violence multiple times during that relationship; on one occasion, he threw her through a closed door, and she was seriously injured and hospitalized. Aimee was forced to get a restraining order against him.

In 2011, Aimee met the future father of her children. They were friends from 2011 to 2014, before they started dating. At the end of 2014, when Aimee was pregnant for their first child, he started to physically abuse her. Between 2014 and 2018, he threatened her with a gun, stalked her, restricted her personal relationships, locked her in a closet and threatened suicide if she left him. The physical and psychological abuse was persistent throughout their relationship, including through the birth of their second child. It continues today in new and terrifying ways, despite their split in 2018. Aimee shared that he has kept her kids from her for indefinite time periods, despite a joint custody order in family court in Florida, and ingested illegal substances in front of them. She has been in an unforgiving, expensive and painful custody battle with their father for years. Her children are now six and seven years old. Knowing the effects of experiencing trauma in the home as a child, Aimee's number one priority is to keep her children safe.

To provide the healthiest, safest environment she can for her children, Aimee knows that she needs to take care of herself. Part of what makes Aimee strong is her recognition of the benefits of active engagement in mental health counseling.[1] Since 2015, Aimee has regularly seen a licensed counselor in Florida to help her understand and address the effects of the trauma

---

[1] Attached as Exhibit "A" is a letter from licensed mental health counselor Bettina V. Fiessinger, LMHC, NCC, Psy.S.

2

she endured as a child and in her romantic relationships. Aimee's therapy has focused on managing the symptoms of post-traumatic stress disorder and battered woman syndrome. She has also been diagnosed with depression, largely due to the intense distress related to her custody battle, her loss of support and financial instability.

Notwithstanding these struggles, Aimee finds time to help her father, who suffers from stage four prostate cancer, despite their historically tumultuous relationship, and her mother, who has multiple sclerosis, chronic obstructive pulmonary disease and diabetes.

## II.     Offense Conduct

In the summer of 2020, seeking a safe haven for her and her children, Aimee moved into a spare bedroom at one of her friend's Florida homes. Coincidentally, Ashley Biden had previously occupied that bedroom. Shortly into her stay, Aimee discovered property belonging to Biden, including a handwritten journal, with highly personal entries mentioning President Joe Biden, tax records, a camera, a cellphone and other private items. In late August 2020, Aimee reached out to co-defendant Robert Kurlander, who suggested selling the items. In the following months, they engaged in efforts to sell Biden's journal, in part, because of the sensitive content it contained about a candidate for president of the United States. Aimee and Kurlander traveled to New York with the journal to meet with the media outlet Project Veritas. After a couple meetings, Aimee and Kurlander released the property to Project Veritas, in exchange for a payment of $40,000. Aimee and Kurlander split the proceeds, with Aimee planning to use her portion to pay legal expenses related to her family court case.

## III.    Sentencing Guidelines Analysis

Pursuant to the plea agreement dated August 12, 2022, Aimee's stipulated Guidelines range is 8 to 14 months, based on an applicable offense level of 11 and Criminal History Category I. PSR ¶ 4. While the Sentencing Guidelines suggests that 8 to 14 months' imprisonment is a reasonable sentence, we disagree. The Probation Office ("Probation") also disagrees. After weighing the § 3553(a) factors in this case, we believe that a sentence of probation, with any conditions this Court deems appropriate, is "sufficient, but not greater than necessary," to serve the purposes of sentencing.

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Pepper v. United States*, 562 U.S. 476 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). This Court is well aware that it has broad discretion in determining an individualized sentence for Aimee pursuant to the Sentencing Reform Act and § 3553(a) and is not to presume the Guidelines as reasonable or be restricted or bound by the Guidelines Range. *See Nelson v. United* States, 550 U.S. 350, 351 (2009). A sentencing court must conduct an "independent review of the sentencing factors" in all cases for each person. *See id.* The aim is to fashion a sentence that is "sufficient, but not greater than necessary," based on an analysis of the § 3553(a) factors as they pertain to a particular

individual offender, such as the purposes of sentencing, including, punishment, deterrence, incapacitation and rehabilitation, and full consideration of the individual offender and their life history and background.

Notwithstanding the Supreme Court's clear mandate that a sentencing court must consider the individualized circumstances of a convicted person's life history and background, the Guidelines are too often relied upon as a talismanic measure by which to impose a sentence. Courts continue to utilize and rely on the Guidelines and their policies even where, as here, they discourage, admonish and fail to accord any numerical value to mitigating factors. Simply put, the directives of *United States v. Booker*, 543 U.S. 220 (2005), *United States v. Crosby*, 397, F. 3d. 103 (2d Cir. 2005), and § 3553(a) make clear that courts must consider all of the factors in § 3553(a), many of which the Guidelines either reject or ignore, or demand to an "extraordinary" degree. Indeed, in some cases, the Guidelines clash outright with § 3553(a)'s primary directive: "to impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. As Supreme Court Justice Paul Stevens put it, the Commission "has not developed any standards or recommendations" for many individual characteristics, but "[t]hese are...matters that § 3553(a) authorizes the sentencing judge to consider," even though they are "not ordinarily considered" under the Guidelines. *Rita v. United States*, 551 U.S. 338 (2007) (Stevens, J., concurring).

Of course, this Court is required to apply the version of the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11(a). However, the Court may nonetheless consider proposed amendments to the Guidelines. *See United States v. Myers*, 854 F.3d 341, (6th Cir. 2017) ("precedents allow consideration of a pending Guidelines amendment") (internal quotation and citation omitted). The United States Sentencing Commission has proposed U.S.S.G. § 4C1.1, titled "Adjustment for Zero-Point Offenders," which will become effective on November 1, 2023. The amendment provides for a 2-level decrease in a defendant's offense level for those, like Aimee, who have zero criminal history points and meet nine other criteria.

Recidivism data analyzed by the Commission suggests that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including those in Criminal History Category I with one criminal history point. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), *available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. If the Court is inclined to consider the 2-level reduction before it takes effect, it may vary downward in light of the proposed amendment.[2]

### IV.   Goals of Sentencing

Pursuant to § 3553(a), the Court must consider the purposes of sentencing, specifically "just punishment," deterrence, recidivism and incapacitation as they relate to Aimee.

---

[2] If the "zero-point offender" adjustment were in effect today, the total offense would be 9, with a corresponding Guidelines range of 4 to 10 months.

4

Assessment of these purposes is often conducted with the view toward the length of an individual's incarceration rather than the propriety of incarceration.

A sentence of probation for Aimee, with any other conditions imposed as the Court deems necessary, is sufficient to serve the purposes of sentencing. Our criminal legal system prioritizes punishment and has less regard for opportunities and second chances. Emphasis on punishment, without due consideration for mitigating factors, has contributed to the social injustice of mass incarceration. The punitive consequences of a felony conviction, such as a diminished sense of stability and safety, social stigma, and shame, have already been felt by Aimee and her family and will undoubtedly be felt for the rest of their lives. *See* Patricia Allard & Judith Greene, Justice Strategies, *Children on the Outside: Voicing the Pain and Human Costs of Parental Incarceration* (2011).

A sufficient degree of punishment in this case does not have to include prison time. Case after case observes that individuals like Aimee without a criminal history are unlikely to reoffend. As previously discussed, criminal history score is a strong predictor of recidivism, and individuals like Aimee with zero criminal history points are significantly less likely to reoffend. Aimee self-surrendered and pleaded guilty in August 2022. There is nothing to suggest that she is a danger to society or needs further deterrence.

Throughout Aimee's life, from the sexual abuse she endured as a child to the unending physical and psychological violence she endures at the hands of her ex-partner, she has suffered significant trauma. Despite the great deal of adversity, Aimee has a history of abiding by the law and contributing to our society. While on bail, Aimee has engaged in ongoing mental health treatment with her trusted counselor, gained and maintained employment and devoted herself to building a secure financial and domestic situation for her children. "[S]urely, if ever a [woman] is to receive credit for the good [s]he has done, and [her] immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of [her] sentencing, when [her] very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14.

Probation acknowledged in its final Presentence Report that a below-Guidelines sentence without a period of incarceration is warranted, given the non-violent nature of the offense, Aimee's lack of criminal history, her mental health issues, family ties and responsibilities and compliance on bail. *See* PSR at 24. We ask the Court whether, given these factors, it would be reasonable to send Aimee to prison for any period of time. We contend that it would be far from reasonable. It would unnecessarily harm Aimee and her young children.

### V.     Conclusion

If Aimee were sentenced to a period of incarceration, her children would be left with a "caretaker," who Aimee knows is simply not equipped to be a parent. She cannot lose them. "Given the egregious behaviors and bizarre, hostile responses the children's father evidences

toward them and [Aimee], it is [her long-time counselor's] professional opinion that she continue therapy in this community setting rather than a carceral setting as this would produce benefits. It would allow her the opportunity to keep her children as safe as possible." Exhibit A. We have had many phone calls with Aimee, where we can hear her kids in the background shouting, "I love you, mom," and where she is encouraging them complete their schoolwork and eat healthy. They are her entire life, and she will always protect them and fight for them with everything she has.

Aimee has been strained psychologically, physically and financially since 2014. In 2020, she made a serious mistake. Aimee knows her conduct was wrong. Her dire financial situation, due almost entirely to the costly and protracted litigation around the custody of her children, clouded her judgment. She is still learning to process her trauma and move forward with a healthy and happy life, and she understands that part of that journey is holding herself accountable for the actions that gave rise to this case. As such, we do not believe that a sentence that includes any period of incarceration is necessary or just.

For the foregoing reasons, we respectfully request that this Court sentence Aimee Harris to a sentence of probation, which is sufficient, but not greater than necessary to serve the purposes of sentencing, pursuant to 18 U.S.C. § 3553(a).

We thank the Court for its consideration in this matter.

Respectfully submitted,

/s/

Anthony Cecutti
Kestine Thiele
*Counsel to Aimee Harris*